UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| MICHELLE WADE, ADAM LARA, JR., AND KANDACE LARA, EACH INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE OF ADAM LARA, SR., DECEASED, AND AS SURVIVING HEIRS OF ADAM LARA, SR., DECEASED,<br><br>Plaintiffs,<br><br>v.<br><br>MINNESOTA LIFE INSURANCE COMPANY,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ CIVIL ACTION NO. 6:13-CV-00055<br>§<br>§<br>§<br>§<br>§ |

## **MEMORANDUM AND ORDER**

Plaintiffs seek review of Defendant Minnesota Life Insurance Company's decision to deny a claim under Adam Lara Sr.'s accidental death and dismemberment insurance policy. Because Lara obtained the policy through his employer, the claim is covered by the Employee Retirement Income Security Act of 1974 (ERISA). 29 U.S.C. § 1001, *et seq*. ERISA limits this Court's review of Minnesota Life's decision to determining whether the insurer abused its discretion.

## I. BACKGROUND

### A. *The Policy*

Lara was eligible for accidental death and dismemberment (AD&D) benefits under a group policy that his employer, PepsiCo, Inc., purchased from Minnesota Life. Docket Entry No. 14-1 at 2. That policy entitled Lara's beneficiaries—his children, the Plaintiffs—to $231,000 in the event of his accidental death. Docket Entry Nos. 14-4, 14-5, 14-6. The policy provides that

> accidental death . . . by accidental injury means that an insured's death . . . results, directly and independently of all other causes, from an accidental injury which is unintended, unexpected, and unforeseen.
> . . . .
> In no event will we pay the accidental death . . . benefit where the insured's death . . . results from or is caused directly or indirectly by any of the following:
> . . . .
> (4) physical . . . illness including diagnosis or treatment for the illness

Docket Entry No. 14-1 at 6, 8. The policy also gives Minnesota Life "discretionary authority to determine and guarantee all benefits according to the terms of the official plan documents and applicable contracts." Docket Entry No. 9-1 at 37.

### B. *Lara's Medical History and Hospitalization*

Adam Lara Sr. developed symptoms of gross hematuria in January 2010 and was referred to an urologist. Docket Entry No. 10-8 at 20. On January 26, 2010, a computer tomography (CT) scan of Lara's abdomen revealed that he had a soft

tissue mass in his right kidney. *Id.* Lara underwent surgery for removal of his right kidney on February 17, 2010. *Id.* The initial pathology revealed that Lara had transitional cell carcinoma. *Id.* M.D. Anderson Cancer Center's review of the pathology revealed Lara had synovial sarcoma. *Id.* By April 2010, it appeared that the cancer had spread to other internal organs. *Id.* In November 2010, a biopsy performed on Lara's left lung confirmed that it had spread. *Id.* at 21. Lara received six cycles on his first round of chemotherapy through early 2011. *Id.* By July 2011, the pulmonary cancerous nodules had increased in size and surgical intervention was recommended. *Id.* However, due to pulmonary emboli in the right pulmonary artery, surgery was delayed, and Lara required a second round of chemotherapy that began August 31, 2011. *Id.*

On September 13, 2011, Lara went to the hospital in Victoria, Texas due to various health issues including fever, headaches, and joint pain. Docket Entry No. 15-7. He was treated for a low platelet count and other conditions over the next several days. *Id.*at 1. On September 18, 2011, Lara's daughter advised physicians that he had been suffering from headaches for two weeks. *Id.*at 1–2. In response, the treating physicians performed a CT scan of Lara's brain. *Id.* at 2. The CT scan revealed that Lara's brain had "numerous subdural hematomas[1] with active and

---

[1] A subdural hematoma is a collection of blood on the brain's surface.

chronic components and likely active bleeding. Nodularity along the dura may reflect metastasis or chronic subdural blood." *Id.* at 1.

The physicians reviewed Lara's CT scan and had him transferred to MD Anderson. *Id.* at 2. Upon arrival at MD Anderson, Lara was unresponsive. Because of this, he was intubated and transferred to the Medical Intensive Care Unit for a second CT brain scan. Docket Entry No. 10-8 at 20–22. This second CT scan confirmed the presence of a "large left subdural hematoma and smaller right subdural hematoma resulting in midline shift, suspected uncal herniation and trapping of the left temporal horn of the lateral ventricle." *Id.* at 22.

On September 19, 2011, a follow-up CT scan revealed that Lara's condition had worsened and he passed away that same day. *Id.* at 22–23. Lara's discharge diagnosis from MD Anderson was "metastatic synovial sarcoma kidney to lung, status post course 1 of Gemcitabine and Taxotere. The patient presents with extensive cranial bleed." *Id.* at 23. MD Anderson's final summary of Lara's treatment listed his cause of death as "extensive subdural hematoma," and gave an overall summary of Lara's cancer diagnosis and cancer treatment. *Id.*

### C. Administrative Claim Process

On September 22, 2011, PepsiCo notified Minnesota Life of Lara's death and gave them the names of his beneficiaries. Docket Entry No. 14-7 at 5. Plaintiffs sought AD&D benefits under the policy and provided Minnesota Life

with Lara's death certificate with his cause of death listed as "pending."  Docket Entry No. 15-2.

On February 8, 2012, Minnesota Life received an amended death certificate describing the immediate cause of death as "subdural hemorrhage due to blunt force trauma and coagulopathy associated with treatment for and complications of metastatic renal sarcoma."  Docket Entry No. 15-3.  Minnesota Life sent Plaintiffs a letter requesting additional information on September 23, 2011.  Docket Entry No. 10-12 at 17–19.  Plaintiffs responded to this request with Lara's medical records and autopsy report.  *Id.* at 2–11.

### 1. *Policy Evaluation and Medical History*

Minnesota Life began evaluating the claim and sent Lara's records for review by Dr. George Battis.  Docket Entry No. 15-6.  Dr. Battis reviewed Lara's medical records, autopsy report, and death certificate in early March 2012 and noted Lara's history of cancer and cancer treatment dating back to January 2010.  *Id*.  He also asserted that Lara had "a right nephrectomy and completed 6 cycles of chemotherapy," and that the medical record did not reflect any reference to trauma or injury to the head.  *Id.* at 1.  In his review, Dr. Battis noted that subdural hematomas are most commonly caused by blunt force trauma.  *Id.* at 2.  But based on Lara's medical history and recent treatment for cancer, Dr. Battis concluded

that Lara's subdural hematomas were more likely the result of coagulopathy secondary to chemotherapy.[2]  *Id.* at 2–3.

Minnesota Life contacted the medical examiner's office and requested any evidence of blunt force trauma or injury to Lara's head.  Docket Entry No. 14-5.  The medical examiner's office confirmed that Lara's medical record did not reflect any head trauma or injury and that they had no other indication of injury to Lara's head.  *Id.*

### 2. Denial of the claim and appeal

On April 19, 2012, Minnesota Life sent letters to Plaintiffs denying their claim because Lara's "death was not the direct result of an accidental injury, independent of all other causes, as defined in the policy."  *Id.*  On August 13, 2011, the Plaintiffs sent a letter through their attorney to Minnesota Life,[3] asserting that the claim was wrongly denied because evidence reflected that Lara's death was an accident caused by blunt force trauma to the head.  Docket Entry No. 10-2 at 39–40.  Minnesota Life sent a letter acknowledging the appeal and gave the opportunity to provide additional supporting evidence to aid in its review, but Plaintiffs declined to provide any.  *Id.* at 36.  As a result, Minnesota Life sent a

---

[2] "[M]edical literature indicates . . . the next [causes for subdural hematoma] have to do with coagulation disorders especially noted with chemotherapy."  Docket Entry No. 10-2 at 8.
[3] Plaintiffs sent the letter after the sixty-day deadline for appeal under ERISA.

letter to the Plaintiffs affirming its denial of the claim on September 7, 2012, after which Plaintiffs filed this case. *Id.* at 34–35.

## II. ANALYSIS

The standard of review the Court applies to an ERISA benefit decision depends on whether it involves the administrator's factual determination or interpretation of the plan. *See Pierre v. Conn. General Life Ins. Co.*, 932 F.2d 1552, 1556 (5th Cir. 1991). When the policy gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the Court reviews the decision for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The administrator has abused its discretion if its actions were arbitrary and capricious or not supported by substantial evidence. *See Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2005). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation and internal quotation marks omitted.)

Minnesota Life's dual role as both the administrator and insurer of the plan does lessen somewhat the deference its decision is afforded. *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395 (5th Cir. 2006) (noting that there is an "inherent conflict of interest" when the entity making the determination serves as both the

administrator and insurer under the policy).  Concern about a conflict is at its strongest when "the circumstances surrounding the plan administrator's decision suggest 'procedural unreasonableness,'" *Schexnayder v. Hartford Life and Acc. Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008)), or when the "administrator has a history of biased claims administration."  *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 249 (5th Cir. 2009) (quoting *Glenn*, 554 U.S. at 117).  Because there is no showing that either of these situations applies in this case,[4] the conflicted administrator is "entitled to all but a modicum of the deference afforded to unconflicted administrators."  *Robinson*, 443 F.3d at 395 (citation and internal quotation marks omitted).

That reduced deference is still too great for Plaintiffs to overcome. Unfortunately, a definitive determination on the cause of Lara's death will likely never be made.  And a sound medical argument can be made that an unidentified blunt force was the direct cause.  But the question for this Court is only whether "some concrete evidence in the administrative record" supported the denial.  *Id.*

---

[4] As to procedure, Minnesota Life reviewed all the information it had concerning Lara's death, submitted it to a doctor for medical review, and contacted the medical examiner to confirm the review's findings.  Plaintiffs failed to show that Minnesota Life's decision process was unreasonable.  Despite the statutory time for appeal having lapsed, Minnesota Life still willingly considered Plaintiffs' appeal, soliciting any additional evidence Plaintiffs believed could bolster their claim.  Despite Minnesota Life going above and beyond its duty as administrator, Plaintiffs did not provide new information, asserting that Minnesota Life already had substantial evidence to support the claim.  *See* Docket Entry No. 16 at 4.

Making Plaintiffs' task even more difficult is the policy language that provides that payment is owed only when death results from an accidental injury "independently of all other causes." In other words, the claim denial must be upheld so long as there is some credible evidence to support a finding that Lara's cancer contributed in some way to his death.

Ample evidence supporting that view exists. First, Lara had an extensive history of cancer treatment and had begun a second round of chemotherapy about two weeks prior to his hospitalization. The record further reflects that Lara's condition was deteriorating throughout the final few weeks leading up to his death, and that he was distraught about "the inevitable." Docket Entry No. 10-3 at 31.[5] The autopsy report and the amended death certificate described "coagulopathy associated with treatment for and complications of metastatic renal sarcoma" as a contributing factor and underlying cause of death. Finally, Dr. Battis concluded that Lara's subdural hematoma was likely caused by coagulopathy secondary to chemotherapy.[6] Against this, while subdural hematomas are commonly caused by head traumas and the medical examiner credited blunt head trauma as the cause of

---

[5] The same nurse's note states that the chaplain spoke to Lara's daughter who was "considering whether hospice might be appropriate at the time." Docket Entry No. 10-3 at 31.

[6] Plaintiffs argue that Minnesota Life acted arbitrarily and capriciously by relying on the opinion of its own physician rather than on an independent physician. Because Dr. Battis's opinion was supported by independent record evidence—the cancer history and autopsy report identifying "coagulopathy associated with treatment for and complication of metastatic renal sarcoma" as a contributing factor—the Court does not find that reliance on his opinion was an abuse of discretion.

death, there is no indication that Lara or a family member reported a head trauma during his hospitalization. The record therefore provides substantial evidence to support Minnesota Life's determination that Lara's death was not independent of all nonaccidental causes.

### III. CONCLUSION

For the reasons stated above, the Court upholds Minnesota Life's denial of benefits under the deferential standard of review that applies. Minnesota Life should submit a proposed final judgment by July 7.

**SIGNED** this 27th day of June, 2014.

_____
Gregg Costa
United States Circuit Judge
(Sitting by Designation)